IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

MARK BRYANT,                          :
                                      :
        Plaintiff,                    :
                                      :
v.                                    :        Civil Action
                                      :        No. 5:11-CV-469 (CAR)
BGHA, Inc., d/b/a                     :
BIG GAME TREESTANDS                   :
                                      :
        Defendant.                    :
_____       :

## ORDER ON DEFENDANT'S MOTIONS TO PRECLUDE EXPERT TESTIMONY AND MOTION FOR SUMMARY JUDGMENT

Before the Court in this products liability action are the following Motions filed by Defendant BGHA, Inc. d/b/a Big Game Treestands:  Motion to Preclude Gary M. Bakken from Testifying at Trial; Motion to Preclude Irving Ojlavo from Testifying at Trial; and Motion for Summary Judgment. For the reasons explained herein, the Court **DENIES** the Motions to Preclude Bakken and Ojalvo [Docs. 34 & 35], and **GRANTS in part** and **DENIES in part** Defendant's Motion for Summary Judgment [Doc. 33].

### INTRODUCTION

This products liability action involves a sixteen-foot, two-man hunting tree stand—the Partner CR5000—manufactured by Defendant in 2005.  On November 29, 2009, Plaintiff fell from the CR5000 while climbing down its ladder and broke his neck in three places.  Plaintiff contends he tripped and fell as a result of the tree stand's defective design

1

and insufficient warnings.  Specifically, Plaintiff states that as he began to descend the ladder, he tripped on a piece of metal tubing that protruded three quarters of an inch above the top ladder rung and was unable to stop his fall due to the stand's inadequate handholds.  Plaintiff claims the protrusion, the lack of handholds, and lack of appropriate warnings were design defects and hazardous conditions that caused his fall and resulting injuries.

In opposition, Defendant maintains the CR5000 was safe for use and not defective in any matter.  Defendant  claims Plaintiff's failure to properly assemble, install, and use the tree stand affected its stability, which in turn caused Plaintiff to lose his balance and fall.  Specifically, Defendant attributes Plaintiff's fall to (1) his improper installation of the CR5000's straps to the tree; (2) his installation of the stand on sloping ground; (3) his connection of the stand to an area of the tree where it branches in two different directions; and (4) his imbalance during descent because he carried his rifle.

## BACKGROUND

Many facts in this case are contested, but the facts pertinent to the resolution of these Motions, viewed in the light most favorable to Plaintiff as the non-moving party, are as follows.

### The Partner CR5000

The tree stand at issue in this case—the Partner CR5000—is a stationary ladder stand used for hunting, which allows the hunter to sit high in a tree and wait for game to

walk by.  The stand consists of a ladder leading to a foot platform and a seat platform that the user connects to a tree with the included straps.

The CR5000's ladder is a double-rail ladder, meaning the ladder has two side rails (or handrails)—one in the front and one in the back.  The back side rail attaches directly to the foot platform.  The front side rail, however, ends below the foot platform and is not level with the top rung of the ladder.  Instead, a three quarter inch metal protrusion extends from the top of each of the front rails.  One of Plaintiff's proffered experts, Gary Bakken, Ph.D., described the protrusions as "sawed off piece[s] of square tubing which means [they have] sharp edges."[1]  Plaintiff contends these protrusions are trip hazards.

The CR5000's foot and seat platforms are made of, what the parties refer to as, steel grate or steel mesh surfaces.  A solid bar surrounds the outside perimeters of the mesh surfaces, and the steel mesh surface is flush with the perimeter bar.  Plaintiff contends this design prohibited the user from adequately gripping the surface during descent.

Instructions and Warnings

The CR5000 is packaged with assembly instructions and warnings.  These instructions are made of paper and are not attached to the stand.  The stand is also packaged with certain straps for the erection and use of the CR5000, including two stabilizer straps and two ratchet straps.  The stabilizer straps are primarily used for installation and are intended "to keep the stand from falling away from the tree or sliding

---

[1] Bakken Dep., pp. 54-55 [Doc. 34-4].

up the tree prior to the user getting up and installing the ratchet straps."[2] The instructions direct the user to crisscross the stabilizer straps around the tree.  The ratchet straps, on the other hand, are vital to the stability of the stand.  The instructions state

**2 VITAL RATCHET STRAPS ARE INCLUDED AND NECESSARY FOR THE . . . CR5000.  DO NOT ATTEMPT TO USE THESE LADDERSTANDS WITHOUT ALL VITAL RATCHET STRAPS SECURED. WARNING! NEVER ATTEMPT TO USE YOUR LADDERSTAND UNTIL THIS STEP IS COMPLETE.  STABILIZER STRAPS & SUPPORT BAR ARE DESIGNED TO ACT IN CONJUNCTION WITH THE VITAL RATCHET STRAP, NEVER ALONE! FAILURE TO FOLLOW THIS WARNING MAY RESULT IN SERIOUS INJURY OR DEATH![3]**

"Once the ratchet straps are installed, they take over the bulk of the strength."[4]

The CR5000 had four warnings directly affixed to the frame.  Two of the warnings are pertinent in this case.  The first states,

**!WARNING!**
**FAILURE TO READ AND UNDERSTAND ALL SAFETY AND ASSEMBLY INSTRUCTIONS MAY RESULT IN SERIOUS INJURY OR DEATH! YOU MAY OBTAIN ANOTHER COPY OF ALL INSTRUCTIONS AND WARNINGS BY CONTACTING BGHA, INC. AT (800)268-5077 OR www.biggametreestands.com.[5]**

This warning was positioned on the back bar of the CR5000, which is located underneath the seat and behind the foot platform, up against the tree, "at the back amongst other labels," such as the identification number and the "Made in China" label.[6]  The second warning states,

---

[2] B. Quiring Dep., p. 148 [Doc. 67].
[3] Treestands and Climbing Systems: Assembly and Installation Instructions, p. 39 [Doc. 33-5].
[4] B. Quiring Dep., p. 149.
[5] CR5000 Warning Labels [Doc. 33-6].
[6] Bakken Dep., p. 115 [Doc. 34-3].

4

**!CAUTION!**

**NEVER CLIMB THIS LADDERSTAND BEFORE THIS PART IS SECURELY STRAPPED TO THE TREE USING RATCHET STRAP PROVIDED! FAILURE TO FOLLOW THIS WARNING MAY CAUSE LADDERSTAND TO COLLAPSE OR TWIST AWAY FROM TREE CAUSING SERIOUS INJURY OR DEATH![7]**

This warning label was located on the side of the seat where the user would not see it until he was in the stand.  The font size of both labels "was so small most consumers could not be expected to read the type without considerable study[.]"[8]  Plaintiff states that he does not remember seeing the warnings and admits he never read them.

Plaintiff's Purchase and Installation of the CR5000

Plaintiff purchased the CR5000 "used" a few months before the accident occurred. When he purchased it, the CR5000 was already assembled and installed to a tree.  The day he purchased it, Plaintiff, along with two other experienced hunters, transferred and installed the stand to the location where the accident occurred a few months later.  The packaged instructions were not included or attached to the stand when Plaintiff purchased it, and Plaintiff neither received nor requested a copy of them.

It is undisputed when the men erected and installed the CR5000, they failed to install the stabilizer straps in accordance with the packaged instructions. Instead of crisscrossing them in accordance with the instructions, Plaintiff wrapped them horizontally around the tree.  Plaintiff does not recall whether he installed the CR5000 with one or two of the vital ratchet straps.  Regardless, Plaintiff maintains all of the straps

---

[7] CR5000 Warning Labels.
[8] Bakken Discl., ¶ 6(r) [Doc. 34-4].

5

were connected tightly around the tree, and the stand was securely installed; it was not loose and did not move, shift, or pivot.  Plaintiff also states they did not install the stand on sloped ground or around a limb of the tree.

The Accident

On November 29, 2009, Plaintiff took his 11-year old nephew deer hunting on the property where he purchased and installed the CR5000 a few months earlier. The two finished hunting that morning and were heading back to get some rest.  On the way back, Plaintiff passed the CR5000 and decided to climb up and see if it would be a good location from which to hunt the next day.

After Plaintiff climbed up into the stand and looked around, he began to descend with his unloaded rifle securely hanging from his right shoulder.  Plaintiff was wearing coveralls with zippered pant-leg openings that were zipped down to his ankles.  As he began his descent, Plaintiff faced the tree and held onto the seat platform with both hands. His fingers were in the steel grate openings, and his palms were on the perimeter bar; he put his right foot onto the highest ladder rung.  While maintaining this three-point contact with the stand, he then proceeded to move his left leg towards the next rung down.  As he brought his left foot down, his pant leg snagged on the metal protrusion at the top end of the ladder's left front side rail, and he lost his grip.  His body rotated backwards, and he fell straight down, landing on his head and breaking his neck in three places.  Plaintiff's

rifle was still on his shoulder when he fell.  As he descended, the CR5000 did not move, shift, or pivot.

Plaintiff filed this action asserting defective design, failure to warn, and punitive damages claims against Defendant.  In support of his defective design and failure to warn claims, Plaintiff offers the opinions of two expert witnesses, Gary Bakken, Ph.D. and Irving Ojalvo, Sc.D., both of whom are mechanical engineers who provide opinions on the CR5000's defective design and cause of Plaintiff's injuries. Bakken also provides opinions on Defendant's failure to warn. Defendant has filed motions to exclude the opinions of both experts and a motion for summary judgment.

## DISCUSSION

The Court's analysis essentially proceeds in three parts.  First, the Court provides a general overview of design defect and failure to warn claims to provide context for its subsequent analysis. Next, the Court evaluates the admissibility of Plaintiff's expert opinions which are critical to the existence of genuine issues of material fact in this case. Finally, the Court addresses Defendant's Motion for Summary Judgment.

### I.      Overview

### A. Design Defect

To recover on his defective design claims, Plaintiff must establish that (1) the CR5000's design is defective and (2) the defective design caused his injuries.  Under Georgia law, a product design is defective if the risks inherent in the design outweigh the

utility or benefit derived from the product.[9]  Although many relevant factors inform this risk-utility analysis, the most important factor is "whether the design chosen was a reasonable one from among the feasible choices of which the manufacturer was aware or should have been aware"; this factor is the "heart" of design defect cases.[10]

When faced with a summary judgment motion, plaintiffs "have the burden to demonstrate a genuine issue of material fact that the product is defectively designed; to do this, they must produce evidence from an expert who is qualified to conduct the risk-utility analysis and to opine that the risks inherent in [the product's] design outweigh the utility or benefit derived from the product."[11]

In general, weighing the risk-utility analysis is left to the jury.[12]  Indeed, judgment as a matter of law "will rarely be granted in design defect cases where any of [the] elements is disputed."[13]  To prevail at summary judgment, a defendant must "show plainly and indisputably an absence of <u>any</u> evidence that a product as designed is defective."[14]

### B.  Failure to Warn

"The manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger."[15]  This duty "arises whenever the manufacturer knows or reasonably should know of the danger arising from

---

[9] *Dean v. Toyota Indus. Equip. Mfg., Inc.*, 246 Ga. App. 255, 259 (2000).

[10] *Banks v. ICI Ams., Inc.*, 264 Ga. 732, 736 (1994).

[11] *In re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig.*, 711 F. Supp. 2d 1348, 1365 (M.D. Ga. 2010); *see also Dean*, 246 Ga. App. at 259.

[12] *See Dean*, 246 Ga. App. at 259.

[13] *Ogletree v. Navistar Int'l Transp. Corp.*, 271 Ga. 644, 646 (1999).

[14] *Id.*

[15] *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994) (internal quotation marks omitted).

the use of its product."[16] Under Georgia law, a manufacturer breaches its duty to warn if it fails to "(1) adequately communicate the warning to the ultimate user or (2) fails to provide an adequate warning of the product's potential risks."[17]  A failure to communicate a warning can involve issues like the "location and presentation of the warning."[18] The failure to adequately warn, by contrast, depends upon the substance of the warning.[19] Proximate cause is a necessary element for both forms of warning defect claims.[20]  It appears Plaintiff asserts both types of failure to warn claims.

## II.    Defendant's Motions to Exclude

In support of his defective design and failure to warn claims, Plaintiff offers the opinions Gary Bakken, Ph.D. and Irving Ojalvo, Sc.D., both of whom are mechanical engineers with expertise in the fields of ladder design, safety, human factors/ergonomics, and warnings.  Bakken and Ojalvo opine that the risks in the CR5000's design outweigh any potential benefits, and therefore the CR5000 is defective.  They also conclude that the CR5000's defective design caused Plaintiff's fall and resulting injuries.  In addition, Bakken opines that Defendant reasonably should have known of the inherent dangers and failed to provide adequate warnings to the user. Defendant argues all of the experts' opinions are inadmissible.  The Court disagrees.

---

[16] *Id.*

[17] *Thornton v. E.I. Du Pont De Nemours  Co., Inc.*, 22 F.3d 284, 289 (11th Cir. 1994).

[18] *Id.*

[19] *Id.*

[20] *Id.*

## A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. [21]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[22]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[23] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[24]  Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual

---

[21] Fed. R. Evid. 702.
[22] *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1257 (11th Cir. 2002) (citing *Maiz v. Virani,* 253 F.3d 641, 664 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke Cnty.,* 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).
[23] 509 U.S. 579 (1993).
[24] *Id.* at 589, n.7; *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1237 (11th Cir. 2005).

rigor that characterizes the practice of an expert in the relevant field."[25] The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[26]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[27] The trial court must also "'conduct an exacting analysis' of the <u>foundations</u> of expert opinions to ensure they meet the standards for admissibility under Rule 702."[28] Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of fact.[29]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[30] In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[31]

---

[25] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).

[26] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).

[27] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

[28] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original).

[29] *See Daubert*, 509 U.S. at 591.

[30] *Id.* at 592-93 & n. 10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

[31] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

Although *Daubert* involved scientific experts, the Supreme Court has clarified that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[32]  Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[33] Finally, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[34]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[35]  Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[36]  Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[37]  In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[38]

---

[32] *See Kumho Tire*, 526 U.S. at 147.

[33] *McClain*, 401 F.3d at 1238 & n. 2; *see also Frazier*, 387 F.3d at 1260.

[34] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).

[35] *Frazier*, 387 F.3d at 1260.

[36] *Id.* at 1260-61.

[37] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).

[38] *Poulis-Minott*, 388 F.3d at 359.

Regarding the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."[39] This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate."[40]

*Daubert* offers four non-exclusive factors courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[41] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[42]  Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court.  The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[43]

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)     Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

---

[39] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592-93) (internal alterations omitted).
[40] *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.
[41] 509 U.S. at 593-95; *see also J & V Dev., Inc.*, 387 F. Supp. 2d at 1224.
[42] *See Kumho Tire*, 526 U.S. at 150-52.
[43] *Id*. at 151-52.

(2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)     Whether the expert has adequately accounted for obvious alternative explanations;

(4)     Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)     Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[44]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[45]

Finally, for admission, the expert testimony must assist the trier of fact.  Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[46]  "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[47]  Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[48]  Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[49]  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[50]  Thus, the court may

---

[44] Fed. R. Evid. 702 advisory committee's note (2000 amendments).

[45] *See id.*

[46] *Frazier*, 387 F.3d at 1262.

[47] *Id.* at 1262-63.

[48] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[49] *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[50] *General Elec. Co.*, 522 U.S. at 146.

14

exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]."[51]   At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder.  A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."[52]  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[53]   A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;"[54] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[55]

## B.  Gary Bakken's Opinions

Plaintiff offers Bakken's opinions regarding the CR5000's defective design, Defendant's failure to warn, and the cause of Plaintiff's fall.  Bakken opines the ladder rail protrusions, the lack of adequate handholds, and the failure to provide adequate warnings are hazardous conditions with no justifiable benefits,[56] and he attributes the cause of Plaintiff's fall and resulting injuries to these defects.  Specifically, Bakken opines that the

---

[51] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).

[52] *Allison*, 184 F.3d at 1311.

[53] *Daubert*, 509 U.S. at 596.

[54] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

[55] *Frazier*, 387 F.3d at 1272.

[56] Bakken Dep., p. 121 ("There is no – absolutely no utility for the protrusion.  There is absolutely no utility for the lack of appropriate handrails. . . . There is no utility for the absence of the appropriate warnings in the appropriate locations.").

protrusion is a trip hazard that was especially dangerous and difficult for the user to avoid when dismounting from the stand because the user's view was obstructed as he climbed out of the stand.  He further states that the lack of appropriate handholds when the user is transitioning from the CR5000's foot platform to the ladder is also a hazardous condition that increases risk of severe injury to the user.  Engaging in a risk/utility analysis, Bakken concludes that Defendant failed to use readily available technologies and economically feasible design features to eliminate the protrusions or provide design features such as handholds and adequate warnings, all of which would have reduced the risk of severe injury to Plaintiff.  He states Defendant could have and should have been aware of the dangerous conditions, and Defendant reasonably could have foreseen that a user like Plaintiff would not be aware of the danger presented by the protrusions and inadequate handholds.

Bakken attributes the cause of Plaintiff's fall to these defects and concludes Plaintiff tripped over the ladder rail protrusion and could not stop his fall due to the lack of appropriate handholds.  Bakken's causation opinion counters Defendant's expert's theory that Plaintiff slipped and fell as a result of his improper assembly of the ladder stand.

As to Defendant's failure to warn, Bakken opines that had Defendant been unable to eliminate the risks of danger, it should have placed prominently displayed and appropriately constructed warning labels near the trip hazard stating that it posed an extreme risk of serious injury or death.  In addition, Defendant should have warned the user of the location of, the need to use, and the probable consequences of not using the appropriate handholds.   Defendant's failure to provide these warnings greatly increased

the user's risk of severe injury.  As to the existing warning labels affixed to the CR5000, Bakken states they were made with a material and print method that faded after exposure to reasonably foreseeable use of the stand and climatic conditions.  Moreover, Bakken opines that the font size of the existing warnings was so small most consumers could not be expected to read the information without considerable study, something a user of the product could not be expected to do.

Defendant seeks to exclude all of Bakken's opinions arguing he lacks adequate background or experience and is otherwise unqualified to provide expert opinions on the design of a commercial ladder stand, tree stand safety, and tree stand warnings. Defendant also contends Bakken's opinions are unreliable because he failed to conduct any tests, and his testimony is based only on speculation.  The Court disagrees.

### 1.  Qualifications

First, the Court finds Bakken is qualified to offer his opinions on the design of the CR5000 ladder stand, tree stand ladder safety, causation, and the lack of adequate warnings.  Bakken holds a Bachelor of Science degree in Mechanical Engineering, a Master of Science degree in Safety, and a Doctorate degree in Industrial Engineering, specializing in human factors, ergonomics, and biomechanics.  He is a registered Certified Professional Ergonomist and has varied educational and work experience, including working for the 3M Company as a Senior Safety and Process Engineer; serving as an adjunct professor teaching Human Factors/Ergonomics and Safety at the University of Arizona for over 15 years; and consulting with Analytica Systems International, Inc. on issues related to human factors, ergonomics, and systems safety for over 30 years.

Bakken has conducted numerous relevant research studies and projects, including his published research on Forensic Human Factors/Ergonomics Issues Regarding Consumer Product Design.  Moreover, he has published articles and books on forensic analysis of human factors and safety in products liability;  he has written books on falls and their related injuries, including *Falls and Related Injuries: Slips, Trips, Missteps and their Consequences*; and he has given numerous presentations on slip, trip, and fall claims and human factors in litigation.  Bakken has addressed numerous ladder-related issues for both plaintiffs and defendants, and he has specifically worked on cases involving deer stands.[57]  Moreover, Bakken has adequate knowledge and experience in the area of warnings.  He has consulted in the development of warnings for equipment, and he has experience with warnings applicable to trip hazards and ladder use handholds.

The Court is not persuaded by Defendant's arguments that Bakken is unqualified to offer his opinions because he has no experience with ladder stands specifically.  Bakken's education and experience, combined with his expertise on ladder-related issues, qualifies him to testify about the design and safety of the ladder stand in this case.  Bakken's lack of specific expertise with ladder stands goes to the weight of his testimony, not its admissibility.

### 2. Reliability

The Court also finds Bakken's opinions are sufficiently reliable and must be evaluated by the trier of fact.  The Court is unpersuaded by Defendant's argument that Bakken's opinions are unreliable because he failed to perform any tests, and his opinions

---

[57] Bakken Dep., p. 30.

are based only on speculation.  In forming his opinions, Bakken reviewed the following:

a.  Photos, reports, and depositions regarding the incident involving Plaintiff and the CR5000 stand;

b.  Photos and measurements of the CR5000, photos and measurements of clothing the same or similar to that Plaintiff was wearing at the time of the fall, photos and measurements of the scene where the fall occurred, and photos and measurements of a person of similar dimensions to Plaintiff wearing the same or similar clothing Plaintiff wore on the day of the accident; and

c.  Measurements of Plaintiff.

Bakken personally visited the scene of the incident, made measurements, and photographed the area.  He inspected, measured, and photographed the CR5000 stand from which Plaintiff fell.  He observed the protrusion and determined it "protrudes above three-quarters of an inch. There is no covering on there that is wider than the space between the cuff and the leg itself[.] The device is square. It has sharp edges all of which would reasonably be expected to catch or snag an individual's clothing and cause the individual to then trip and then fall."[58]

After inspecting and measuring the stand, Bakken performed static testing at the scene to determine if, in fact, a pant leg could become snagged on the protrusion.  Plaintiff was present at the scene explaining his exact foot and hand placements on the stand the day he fell.  Bakken observed a person of similar dimensions to Plaintiff, wearing similar clothing Plaintiff wore the day of the incident.  He watched the model climb up the ladder

---

[58] *Id.* at pp. 54-55.

and put his hands and feet in the places Plaintiff indicated.  Bakken observed the interaction of the cuff of the model's pant leg with the protrusion of the ladder rail. Bakken explained he performed this testing to "get a position where the person . . . could put his hands at the location and orientation directed by [Plaintiff], and that he could put the coverall cuff in a configuration and location relative to the protrusion as directed by me."[59]  From these observations, Bakken determined the protrusion was a trip hazard upon which the pant leg cuff can be snagged.[60]  He also determined that there are no handholds on the CR5000, and the places to grasp were insufficient.  "They require you to put your fingers into the mesh openings.  The mesh openings are metal with sharp edges so that is going to have an effect on how you grip.  It is going to have an effect on any feedback you get in the dynamic situation."[61]  Thus, from this data Bakken was able to conclude that the CR5000 lacked adequate handholds.

Bakken's opinions are reliable despite his failure to re-create an actual trip and fall or observe a person actually snag his pant leg on the protrusion.  Any such testing was unnecessary to the formation of his opinions.  As Bakken explained in his deposition, "[m]y function was to simply look at the treestand, look at the documentation, what hazards existed in the treestand, what conditions existed with the installed treestand that were consistent or inconsistent with the events described by . . . [Plaintiff] . . . and [the defense expert's] slip and fall theory."[62]  Accordingly, the Court finds Bakken's methods are reliable in the formation of his opinions.

---

[59] *Id.* at p. 15.
[60] *Id.* at p. 65.
[61] *Id.* at p. 79.
[62] *Id.* at pp. 24-25.

a. **Advisory Committee Notes Factors**

The Court also finds Bakken's opinions are sufficiently reliable when considering the factors outlined in the advisory committee's notes to Rule 702, which the Court finds to be more helpful in evaluating the reliability of Bakken's opinions than the *Daubert* factor

First, Bakken's opinions that the CR5000 is defective and the defects caused Plaintiff to trip and fall are not unjustifiable extrapolations from an accepted premise in the case. His opinions are based on his extensive scientific background, education, experience, and research, together with his personal observations of the CR5000 itself, the scene where the incident occurred, and the placement and position of where Plaintiff states his hands and feet were the day of the incident by a person of Plaintiff's size and weight, wearing similar clothes and shoes.

Moreover, Bakken clearly understands and accounts for Defendant's alternative explanations as to the cause of Plaintiff's fall and specifically refutes them.   Bakken explains the problems with Defendant's theory that the protrusion is not a trip hazard because it is an open and obvious condition.[63] He acknowledges Plaintiff did not erect the CR5000 in accordance with the instructions and that Plaintiff was carrying his rifle during the descent, and methodically gives reasons why these conditions did not cause Plaintiff to fall.[64]   He specifically accounts for and then refutes Defendant's slip and fall theory.[65]

---

[63] *Id.* at pp. 76-77, 81.
[64] *Id.* at pp. 45-48; 117-18.
[65] *Id.* at pp. 135-142.

Finally, Bakken addresses and provides counter explanations to the opinions of Defendant's experts.[66]

Additionally, it appears Bakken is being as careful as he would be in his regular professional work outside his paid litigation consulting under the circumstances of this case.

### 3. Assistance to Trier of Fact

The Court also finds Bakken's opinions will be helpful to the jury with its determination of the defective design, failure to warn, and causation issues raised in this case. Bakken identifies the alleged defective conditions of the CR5000, and then explains how the defects interact with the mechanisms of Plaintiff's fall to support his conclusion that the defects caused Plaintiff to trip and fall. Bakken's testimony concerns matters beyond the understanding of the average layperson, and it offers more than what the lawyers for the parties can argue in closing arguments. Moreover, the data upon which Bakken's opinions are based "fits" with the facts of this case. As the Court previously noted, no large analytic leap exists between the facts of the case and Bakken's opinions. Finally, for all of Bakken's opinions, the Court follows what the Supreme Court advised in *Daubert:* "Vigorous cross-examination, presentation of contrary evidence, and careful

---

[66] *Id.*

instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence."[67]

### C. Irving Oljavo's Opinions

Plaintiff also offers Irving Oljavo's opinions regarding the CR5000's defective design and the cause of Plaintiff's fall.[68]  Oljavo opines that the CR5000 is defective because (1) the protrusions at the top of the ladder side rails are designs that serve no useful structural load-support purpose and acted as an impediment to Plaintiff's smooth transfer between the ladder stand's platform and its access ladder; (2) Plaintiff's inability to adequately support himself during this transfer was hampered by the lack of ladder side rails extending above the platform level, depriving Plaintiff of useful power handgrip supports; and (3) the particular steel grate seat design forced Plaintiff to use of the front edge of the seat platform for his support, which did not permit Plaintiff to develop a wrap-around power hand grip.  Ojalvo concludes that the combination of these defects caused Plaintiff to lose his balance without the ability to recover it, leading to his fall and severe injuries.  Ojalvo states the hazards were foreseeable, and it was both technologically and economically feasible for Defendant to correct the design deficiencies prior to releasing the CR5000 for consumer use.

As with Bakken, Defrendant contends that Ojalvo's opinions should be excluded because he lacks the adequate background and is otherwise unqualified to provide expert opinions on the design of a commercial ladder stand or tree stand safety.  Defendant also contends Ojalvo's opinions are unreliable because he failed to conduct any tests, and his

---

[67] *Daubert*, 509 U.S. at 596.
[68] Plaintiff concedes that Oljavo will offer no opinions on the failure to warn claims.

testimony is based only on speculation.  Once again, the Court disagrees.

**1. Qualifications**

First, the Court finds Ojalvo is qualified to offer his opinions on the design of the CR5000, tree stand ladder safety, and the cause of Plaintiff's fall.  Ojalvo holds a Bachelor of Science, a Master of Science, and a Doctorate degree in Mechanical Engineering.  He is a licensed Professional Engineer and has varied educational and work experience, including working for the aerospace industry for over 20 years; serving as Chairman and Bullard Professor of Mechanical Engineering at the University of Bridgeport for seven years; and serving as Senior Scientist at Columbia University for five years.

Moreover, Ojalvo is a member of the Safety Committee, Human Factors & Ergonomics Society; the Safety Council, Institute of Transportation Engineers; and a voting member of the American National Standards Institute (ANSI) Ladder Safety Committee, a role in which he has been active for over a decade.  He has investigated over one hundred falls from ladders and has published peer-reviewed papers in the area of ladder safety.  Defendant's argument that Ojalvo is unqualified to offer his opinions because he lacks specific experience regarding ladder stands is unpersuasive.  Ojalvo's lack of specific expertise with ladder stands goes to the weight of his testimony, not its admissibility.

**2. Reliability**

The Court also finds Ojalvo's opinions are sufficiently reliable and must be evaluated by the trier of fact.  The Court is unpersuaded by Defendant's argument that Ojalvo's opinions are unreliable because he failed to perform any tests, and his opinions are based only on speculation.  In forming his opinions, Ojalvo reviewed the following:

    a.   Photos and measurements of the CR5000 stand;

    b.   Plaintiff's deposition;

    c.   Defendant's representative's deposition;

    d.   Georgia State Uniform Hunter Casualty report for the incident;

    e.   Assembly and instructions for various models of Defendant's tree stands;

    f.   Various sales catalogues showing and describing Defendant's products;

    g.   Measurements of Plaintiff;

    h.   Photos and measurement of clothing the same or similar to what Plaintiff was wearing at the time of the fall;

    i.   Photos and measurements of the scene where the fall occurred;

    j.   Photos and measurements of a person of similar dimensions to Plaintiff wearing same or similar clothing as Plaintiff descending from the stand;

    k.   Occupational Safety and Health Administration (OSHA) and American National Standards Institute (ANSI) safety standards dealing with fixed and portable extension ladders; and

    l.   Photos and video taken by Ojalvo's partner, Dr. Lowell Baker, during Baker's inspection and testing of the CR5000.

Due to a medical procedure, Ojalvo was unable to personally visit the scene of the incident and inspect the CR5000.  However, his partner, Dr. Baker, inspected the CR5000 at the accident site where Baker took measurements, photos, and video.  Ojalvo reviewed and analyzed the data Baker gathered, and he also reviewed and analyzed the photographs and measurements taken during Dr. Bakken's inspections.  Ojalvo formed his opinions

from this data, his education, and his experience.

The Court rejects Defendant's argument that Ojalvo's opinions must be excluded as "eyeballing opinions"—unreliable opinions that are based a pure visual examination.  As set forth above, Ojalvo clearly reviewed and analyzed an abundance of data, including data from his partner's testing on the CR5000.

### a.  Advisory Committee Notes Factors

Moreover, the Court finds Ojalvo's opinions are sufficiently reliable when considering the factors outlined in the advisory committee's notes to Rule 702.  First, Ojalvo's opinions are not unjustifiable extrapolations from an accepted premise in the case. His opinions are based on his extensive scientific background, education, experience, and research, together with his analysis of photos, measurement, and video of the CR5000 itself, the scene where the incident occurred, and the placement and position of where Plaintiff states his hands and feet were the day of the incident by person of Plaintiff's size and weight, wearing similar clothes and shoes.

Further, Ojalvo clearly understands and accounts for Defendant's alternative explanations as to cause of Plaintiff's fall and specifically refutes them.   Ojalvo acknowledges that installing the CR5000 with only one ratchet strap (as Defendant contends Plaintiff did in this case) could affect the stability of the stand, and then Ojalvo explains why the way in which Plaintiff installed the stand had no bearing on the accident.[69]  He also explains the problems with Defendant's theory that the protrusion is

---

[69] Ojalvo Dep., pp. 29-30 [Doc. 35-3].

not a trip hazard because it is an open and obvious condition.[70] He acknowledges that Plaintiff did not erect the CR5000 in accordance with the instructions and that Plaintiff was carrying his rifle during the descent, and gives reasons why these conditions did not cause Plaintiff to fall.[71]  Moreover, he accounts for and then refutes the contrary opinions of Defendant's experts and Defendant's slip and fall theory.[72]

Additionally, it appears Ojalvo is being as careful as he would be in his regular professional work outside his paid litigation consulting under the circumstances of this case.

### 3. Assistance to Trier of Fact

The Court also finds Ojalvo's opinions will be helpful to the jury in determining both the defective design and causation issues raised in this case.  Ojalvo identifies the alleged defective conditions of the stand, and then explains how the defects interact with the mechanisms of Plaintiff's fall to support his conclusion that the defects caused Plaintiff to trip and fall.  Ojalvo's testimony concerns matters beyond the understanding of the average layperson, and it offers more than what the lawyers for the parties can argue in closing arguments.  Moreover, the data upon which Ojalvo's opinions are based "fits" with the facts of this case—no large analytic leap exists between the facts of the case and Ojalvo's opinions.  Finally, with Ojalvo's opinions, like with Bakken's opinions, the Court

---

[70] *Id.* at pp. 49.
[71] *Id.* at pp. 100-02; 136-39.
[72] *Id.* at p. 139.

follows what the Supreme Court advised in *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence."[73]

The Court will not exclude Ojalvo's testimony as cumulative of Bakken's testimony. While the two experts ultimately reach the same conclusions, they have different backgrounds, perspectives, and methodology. Thus, both experts may testify.

### III.   Motion for Summary Judgment

Defendant moves for summary judgment on each of Plaintiff's claims.

### A. Standard

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[74] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[75] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[76]

---

[73] *Daubert*, 509 U.S. at 596.
[74] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[75] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).
[76] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324-26.

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[77]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[78]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[79]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[80]  "The court may not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[81]

## B. Discussion

Plaintiff asserts strict liability design defect and failure to warn claims, contending Defendant manufactured and sold a defective product which contained a trip hazard, lacked adequate handholds, and lacked appropriate warnings.   In Georgia, "a manufacturer has a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses."[82]   A

---

[77] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[78] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[79] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[80] *Id.* (internal quotation marks omitted).

[81] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[82] *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994).

manufacturer is strictly liable if someone "suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained."[83]

### 1. Defective Design Claims

Defendant argues Plaintiff cannot establish the CR5000 has a defect or that a defect caused Plaintiff's injuries.  However, as discussed above, Dr. Bakken and Dr. Ojalvo's opinions clearly create genuine issues of material fact as to whether the CR-5000's ladder-rail protrusions and the lack of adequate handholds are design defects and whether these alleged defects caused Plaintiff's fall and resulting injuries.   "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases."[84]   Defendant is not entitled to summary judgment on Plaintiff's defective design claims.

### 2. Failure to Warn Claims

A seller's duty to warn may be breached in one of two ways: "by (1) failing to adequately communicate the warning to the ultimate user or (2) by failing to provide an adequate warning of the product's risks."[85]   A failure to communicate a warning can involve issues like the "location and presentation of the warning."[86] The failure to adequately warn, by contrast, depends upon the substance of the warning.[87]   Proximate

---

[83] O.C.G.A. § 51-1-11(b)(1).
[84] *Ogletree*, 245 Ga. App. at 3.
[85] *Wilson Food Corp. v. Turner*, 218 Ga. App. 74, 75 (1995).
[86] *Id.*
[87] *Id.*

cause is a necessary element for both forms of warning defect claims.[88]   It appears Plaintiff asserts both types of failure to warn claims.

Defendant first argues Plaintiff's failure to warn claims fail because Plaintiff did not read the warnings on the CR5000.   "[F]ailure to read instructions or printed warnings will prevent a plaintiff from recovering on a claim grounded on failure to provide adequate warning of the product's potential risk[.]"[89]   It is undisputed that Plaintiff failed to read the warnings affixed to the CR5000.   Thus, any claim regarding the substance of the warnings fails as a matter of law.[90]

However, Plaintiff's failure to read the warnings does not bar his failure to communicate claim.   "[F]ailure to read a warning does not bar recovery when the plaintiff is challenging the adequacy of the efforts of the manufacturer or seller to communicate the dangers of the product to the buyer or user."[91]   Indeed, Plaintiff's failure to read the warnings may be circumstantial evidence of the inadequacy of the warnings.[92]   Bakken opines that the warning labels on the CR5000 were not designed to remain clear and legible during the expected lifespan of the product and exposure to the elements.[93]   He states that the warnings were made of a material and print method that were easily degraded as a result of exposure to the reasonably foreseeable use and climatic conditions.[94]   Moreover, Bakken states that Defendant should reasonably foresee that the

---

[88] *Id.*

[89] *Id.* (internal quotation marks and citations omitted).

[90] *Id.* ("[W]here a plaintiff does not read an allegedly inadequate warning, the adequacy of the warning's contents cannot be a proximate cause of the plaintiff's injuries.").

[91] *Id.* (internal quotation marks and citations omitted).

[92] *Id.*

[93] Bakken Discl., ¶6(q).

[94] *Id.*

warning labels on the CR5000 contain a font size so small most consumers could not be expected to read the information without conciderable study, something a user of the product could not be expected to do.[95]   The position, color, size, and print of the warning labels are factual matters to consider in deciding whether Defendant failed to adequately communicate the dangers of the CR5000.[96]   Under Georgia law, "[w]hether the warning if communicated was adequate, [is a] uniformly held question[] for the jury."[97]

Defendant also argues Plaintiff's failure to warn claims fail because the three quarter inch protrusion was open and obvious.  "It is well established that a manufacturer or seller has no duty to warn of a product danger that is obvious or generally known."[98] Here, however, a question of fact exists as to whether the protrusions were, in fact, obvious dangers.  Dr. Bakken points out that while the user could identify that the protrusion rises above the top rung by three-quarters of an inch, the user would not be able to recognize its inherent danger.  "It's obvious it sticks up to three-quarters of an inch. Its importance is not obvious."[99]   Likewise, Dr. Ojalvo states that the mere fact the protrusion is visible "doesn't mean people are going to pick up the significance of it. . . . Whether your brain is going to recognize it as a hazard really depends on your experience with safety."[100]   Thus, questions of fact exist as to whether Defendant failed to adequately communicate to the user the product's potential risks.

### 3.  Punitive Damages Claim

---

[95] *Id.* at ¶6(r).

[96] *Wilson Food Corp.,* 218 Ga. App. at 75.

[97] *Watson v. Uniden Corp. of Am.,* 775 F.2d 1514, 1516 (11th Cir. 1985).

[98] *Vickery v. Waste Mngmt. of Ga., Inc.,* 249 Ga. App. 659, 660 (2001) (citation omitted).

[99] Bakken Dep., p. 81.

[100] Ojalvo Dep., pp. 48-49.

Under Georgia law, punitive damages may only be awarded when the plaintiff proves "by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."[101] "Mere negligence, although gross, will not alone authorize the recovery of punitive damages."[102] "In contrast to gross negligence, the expression 'conscious indifference to consequences' means an intentional disregard of the rights of another, knowingly or willfully disregarding such rights."[103]  To award punitive damages, "[t]here must be circumstances of aggravation or outrage."[104]

The evidence in this case does not support a punitive damages award.  No evidence exists that Defendant knew of or received any reports or complaints of any falls as a result of a trip hazard or lack of appropriate handholds.  In addition, the evidence shows many of Defendant's competitors had ladder stands with side rail designs that were the same or similar to the design of the CR5000.  Moreover, the CR5000 was found to be in compliance with applicable TMA/ASTM standards.  As a general rule, punitive damages are not appropriate in cases where a manufacturer complies with regulatory standards.[105]

Evidence that the CR5000 was mass produced in China with little oversight may support an issue of fact as to Defendant's negligence or even gross negligence, but it does

---

[101] O.C.G.A. § 51-12-5.1(b).

[102] *Trotter v. Summerour*, 273 Ga. App. 263, 265 (2005).

[103] *Id.*

[104] *Id.*

[105] *Stone Man, Inc. v. Green*, 263 Ga. 470, 471-72 (1993); *Welch v. Gen. Motors Corp.*, 949 F.Supp. 843, 845-46 (N.D. Ga. 1996).

not demonstrate maliciousness or willful misconduct.  Thus, Plaintiff's punitive damages claim fails as a matter of law.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion to Preclude Gary M. Bakken from Testifying at Trial [Doc. 34] and Motion to Preclude Irving Ojlavo from Testifying at Trial [Doc. 35] are **DENIED**.  Defendant's Motion for Summary [Doc. 33] is **GRANTED in part** and **DENIED in part.**

**SO ORDERED,** this 27th day of March, 2014.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

SSH/bbp